UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN M. GLASSER, Regional
Director of the Seventh Region of the
National Labor Relations Board, for
and on behalf of the NATIONAL
LABOR RELATIONS BOARD,

        Petitioner,

v.

                                     Case No. 10-13683
                                     Honorable Patrick J. Duggan

COMAU, INC. and COMAU
EMPLOYEES ASSOCIATION,

        Respondents.

_____/

## OPINION AND ORDER

On September 15, 2010, Stephen M. Glasser, as Regional Director of the Seventh

Region of the National Labor Relations Board (the "NLRB" or "Board"), filed a petition

on behalf of the Board, seeking interim injunctive relief pursuant to § 10(j) of the

National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j). The petition for injunction

follows charges of unfair labor practices allegedly committed by Comau, Inc. ("Comau")

and Comau Employees Association ("CEA"), a labor union. Petitioner (hereinafter also

referred to as the "NLRB" or "Board") filed an amended petition on October 4, 2010.

CEA filed an answer to the petition. Comau filed an answer to the petition and a motion

to dismiss. This Court held a hearing with respect to the petition and Comau's motion to

dismiss on January 13, 2011. For the reasons that follow, the Court denies the Board's

request for an injunction pursuant to § 10(j) and Comau's motion to dismiss.

I.      **Factual and Procedural Background**

Comau designs, builds, sells, and installs automated industrial systems, including automated assembly lines.  Its headquarters are in Southfield, Michigan, and additional facilities are located in the Metropolitan Detroit area.  Comau has recognized, and been dealing with, three independent labor organizations for many years.  The members of the bargaining unit at issue here were represented by the Progressive Employees Association ("PEA") from the mid-1970s forward.  This unit includes highly skilled trades classifications, such as toolmakers, machine builders, pipefitters, and electricians.[1]  In 2004, the employees voted to change the name of their union from PEA to Automated Systems Workers "(ASW").

In 2007, the ASW's leadership began considering the possibility of affiliating with a larger union and eventually decided upon the Michigan Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America ("MRCC").  Proponents of the ASW/MRCC merger hoped that it would, among other things, improve the ASW's

------

[1]Specifically, the bargaining unit at issue is defined as:

All full-time and regular part-time production and maintenance employees, inspectors and field service employees, employed by [Comau] at and out of its facilities located at 20950, 21000, and 21175 Telegraph Road, Southfield, Michigan; and 42850 West Ten Mile Road, Novi, Michigan; and machinists currently working at its 44000 Grand River, Novi, Michigan facility who formerly worked at its facility located at 21175 Telegraph Road, Southfield, Michigan, but excluding all office clerical employees, and guards and supervisors as defined in the [NLRA]."

(Doc. 1 Ex. 1 at 2 n.2.)

2

bargaining strength, offer more opportunities for training, and increase job opportunities for members of the bargaining unit.  The merger, however, resulted in much higher union dues for members– up to $2,500 per year compared to $240 per year.  The ASW bargaining unit voted to approve the merger with the MRCC effective March 31, 2007.

At the time of the ASW/MRCC merger, a collective bargaining agreement ("CBA") was in effect and due to expire in March 2008.  Therefore, in 2008, Comau and the ASW/MRCC began negotiations for a new CBA.  The parties eventually agreed to extend the existing CBA through December 21, 2008, while negotiations proceeded.  The issue of health insurance coverage was an area of contention between the parties.

Under the existing CBA, unit employees were not required to pay any premiums for the company-provided Blue Cross Blue Shield coverage.  During the 2008 negotiations, Comau offered to continue the same self-insured plan, but indicated that unit employees would be required to pay health insurance premiums for their coverage.  The premiums under Comau's proposal ranged from $57.28 to $453.05 per month, depending on the level of benefits chosen and the type of coverage (i.e. individual, two-person, or family).

At a December 3, 2008 bargaining session, Comau declared that the parties were at impasse, gave 14 days notice that it was canceling the contract extension, and stated that it would impose its Last Best Offer on December 22 when the prior CBA expired.  At the same time, Comau sent letters to bargaining unit employees describing the key changes to their insurance coverage, as well as some other rule changes, that would be imposed on

3

December 22.  Due to the steps needed to implement the new insurance plan, Comau also informed bargaining unit employees that the new health insurance plan would not go into effect until March 1, 2009.

While Comau declared a bargaining impasse in December 2008, it continued to negotiate with ASW/MRCC representatives from December 8, 2008 through March 20, 2009.  On approximately ten occasions during this time frame, the parties, through healthcare insurance subcommittees, met for negotiations regarding health insurance. One of the proposals discussed in these negotiations was the ASW/MRCC's suggestion that Comau stop paying to finance its own self-insured health insurance plan and instead make contributions to help cover the cost of insuring unit employees under an MRCC health insurance plan.  Negotiations during this time period focused on the amount Comau would contribute towards its employees' coverage under the MRCC plan.

In the meantime, by late 2008, members of the bargaining unit had begun to voice their unhappiness with the ASW/MRCC.  In addition to their concern that they would have to pay significant health insurance premiums, employees believed the union charged unduly high dues, was not effective in negotiating a new contract with Comau, and had failed during its brief representation to deliver promises of additional jobs and training for employees.  In December 2008, all but two ASW/MRCC executive committee members met to discuss decertification of the union.  The two members who did not participate in the decertification discussions were Pete Reuter and Darrell Robertson, former Comau employees who left their employment to become full-time MRCC officials following the

4

ASW/MRCC affiliation.

Sometime in December 2008, ASW/MRCC executive committee member Dave Baloga went to the Detroit NLRB office to find out how to accomplish decertification. In early 2009, all of the members of the executive committee, except Reuter and Robertson, voted to decertify the ASW/MRCC– their own union. Based on what Baloga learned at the NLRB, the executive committee prepared a decertification petition sometime in January 2009 to accomplish this goal.

On February 18, 2009, employee Frederick Lutz signed a written request that the ASW executive committee initiate decertification proceedings. The executive committee thereafter began gathering employee signatures (including their own) on the decertification petition, and also on individual Authorization for Representation forms authorizing the CEA to serve as the bargaining unit's collective bargaining representative. Executive committee members subsequently were warned that any member who circulated the petition could be disciplined or sued by the ASW/MRCC. Executive committee members thereafter redacted their names and signatures from the petition and turned over the responsibility for circulating the petition to employee Willie Rush. In mid-February 2009, Rush turned the decertification materials over to unit employees to pass around Comau's facilities for additional signatures.

Before March 1, 2009, eighty-four bargaining unit members (including the thirteen executive board members whose names and signatures were subsequently redacted) had

signed the petition, representing 47% of the bargaining unit.[2]  (Doc. 31 Ex. AA.) Seventy-

six employees had signed Authorization for Representation forms by that date,

representing 42% of the membership.  (*Id.* Ex. BB.)  In the meantime, Comau had

continued to prepare for the new health care plan announced in December 22, 2008.  This

included holding meetings for employees in January 2009 regarding the new plan and

disbursing and collecting enrollment forms.

On March 1, 2009, a Sunday, Comau put the new health care plan into effect as

planned.  The first premiums for coverage were deducted from employee paychecks on

March 6, 2009.  In the nine days following the implementation of the new health

insurance plan, thirty-four additional bargaining unit members signed the decertification

petition and Authorization for Representation forms.  (*Id.* Exs. AA, BB.)

Rushing thereafter returned the decertification petition and Authorization for

Representation forms to Dan Malloy, an executive committee member.  The executive

committee at that point decided to delay filing the petition with the NLRB, as the

ASW/MRCC had made some new promises regarding job opportunities for laid off

workers that the committee hoped would materialize.  When the jobs did not materialize,

---

[2]According to ALJ Carter's decision, the parties stipulated that there were 178
employees in the bargaining unit on December 22, 2009.  (Doc. 58 Ex. A at 9 n. 17.)  The
ALJ found evidence in the record indicating that there were 234-237 employees in the
unit as of April 14, 2009.  (*Id.*)  Comau's and the CEA's pleadings suggest to the Court
that the bargaining unit in March 2009 consisted of closer to 178 members.  (*See, e.g.*,
Doc. 31 at 9 (providing that 118 signatures constituted 66.2% of the membership and that
105 signatures constituted 58.9% of the membership).)

Rushing retrieved the petition from Malloy and filed it with the NLRB on or about April 14, 2009.  In late April or early May 2009, Rushing met with MRCC director Doug Buckler and explained the rationale for the decertification petition: MRCC's failure to provide promised training; that the ASW's affiliation with the MRCC had not opened up members' eligibility for more jobs; the high cost of MRCC union dues; and the quality of the MRCC health insurance that the ASW/MRCC proposed belatedly in negotiations as an alternative to Comau's plan.

Meanwhile, on March 5, 2009, the ASW/MRCC (hereafter also referred to as the "Charging Union") filed charges against Comau alleging unfair labor practices based on the company's December 22, 2008 implementation of its Last Best Offer (or "LBO"), including the announcement of Comau's proposed health insurance plan.  (Doc. 34 Ex. E Tabs E, F.)  These charges were docketed as NLRB Case Numbers 7-CA-51886 and 7-CA-51906.  On May 29, 2009, after an investigation, the Regional Director dismissed those charges.  (*Id*. Tab G.)  The charging union appealed that dismissal and, on August 31, 2009, the General Counsel's office denied the appeal finding that the parties were at a lawful impasse when the implementation occurred and thus Comau's implementation of its Last Best Offer did not constitute an unlawful labor practice.  (*Id*. Tab H.)

Before the General Counsel's August 31 ruling, on May 19, 2009, the ASW/MRCC filed new charges alleging unfair labor practices by Comau in violation of Sections 8(a)(5) and (1) of the NLRA.  These charges, docketed as NLRB Case No. 7-

7

CA-52106, complained of various acts of alleged "bad faith bargaining."[3]  The initial

complaint was silent with respect to Comau's March 1, 2009 unilateral implementation of

the new health care plan.  (Doc. 34 Ex. E. ¶ 21.)  On July 28, 2009, however, on the

advice of NLRB agent Linda Hammell, the ASW/MRCC amended the charge to also

allege that Comau's March 1, 2009 action constituted an unfair labor practice.[4]  (*Id*. Ex. E

Tabs I, J.)  The Regional Director issued the Complaint ("Complaint I") based on the

charges on August 28, 2009.  (*Id*. Tab K.)

The Regional Director also determined that substantial and material issues of fact

existed as to whether the alleged unfair labor practices bore a causal relationship to the

employee disaffection reflected in the decertification petition filed on April 14, 2009,

which had been assigned Case No. 7-RD-3644.  (*Id*.)  The Regional Director therefore

ordered the two cases heard together before an administrative law judge.  (*Id*.)

Administrative proceedings were conducted before Administrative Law Judge Paul

Bogas in November 2009.  In the meantime, members of the bargaining unit became

frustrated by the fact that the decertification petition had not resulted in an election and

------

[3]The union charged that Comau failed to bargain in good faith by: failing to cloak
its representatives with the authority to make proposals or enter into binding agreements;
submitting written proposals to the Union without attempting to gain authority to do so;
and introducing a new demand that the Union absorb Comau's liability for previously
accrued health insurance "trailing costs."

[4]Comau contends that Hammell's role in the amended complaint was
inappropriate.  The Court finds it unnecessary to address this assertion at this time.

was being held in abeyance by the Board.  In December 2009, bargaining unit members

researched the NLRB rules and hired a consultant.  As a result, the employees prepared

and circulated a "disaffection petition" on which they collected the signatures of 103 of

the 178 members of the bargaining unit.  (Doc. 34 Ex. H.)

In addition to stating that those signing the petition no longer wanted to be

represented by the ASW/MRCC and wanted to be represented immediately by the CEA,

the disaffection petition states:

> We no longer want to be represented by the Automated System Workers
> Local 1123 (a Division of the Michigan Regional Council of Carpenters)
> because of the excessive dues that the Union charges us each month and
> because it has not come through on its promises to increase job
> opportunities for us – and not because Comau Inc. in the last year or so
> unilaterally implemented new terms of employment for us including the
> Company health care plan.

(*Id.*)  The disaffection petition was submitted directly to Comau on December 22, 2009

(not to be confused with December 22, <u>2008</u>, the date Comau imposed its Last Best

Offer).

When the disaffection petition was circulated, bargaining unit members also were

asked if they would be willing to sign declarations stating that they signed the disaffection

petition voluntarily, of their own free will, were not coerced or forced to sign by anyone

from Comau or CEA, and that they "do not want the ASW, the Carpenters Industrial

Council (CIC) or the MRCC to represent [them] in collective bargaining."  (Doc. 34 Ex.

DD.)  90 members of the bargaining unit signed such declarations.  Members who signed

the declarations were presented with two versions and, if they were willing to sign, were

asked to sign the one which best reflected their opinions. 83 of the 90 members who signed the declarations chose the version that include the above language, in addition to the phrase: "I am fearful that I may be retaliated against by the leadership of the ASW 1123 or someone from the CIC for exercising my rights under the law." (*Id.*)

When a disaffection petition is presented to an employer, the employer generally, after validating the signatures, must, according to NLRB rules and precedents, withdraw recognition from the union then representing the bargaining unit and is permitted to recognize the union that the majority designates as their bargaining representative. Comau did just that on December 22, 2009, withdrawing recognition of the ASW/MRCC and recognizing the CEA as the bargaining unit's designated bargaining representative.

Comau and the CEA thereafter engaged in negotiations for a new CBA. On May 14, 2010, they executed a CBA, which had been ratified by the CEA membership in April 2010. This new CBA includes the same health insurance plan implemented by Comau on March 1, 2009. The CBA also includes a union security provision which requires bargaining unit members to pay union dues to the CEA.

On December 29, 2009, the ASW/MRCC filed new charges alleging that Comau violated Sections 8(a)(1), (2), and (5) of the NLRA by withdrawing recognition of the union and giving unlawful assistance to and recognizing the CEA as the collective bargaining representative of its employees. This charge was assigned Case No. 7-CA-52614. The Charging Union filed additional charges against Comau and the CEA, on May 20, 2010, which were assigned Case Nos. 7-CA-52939 and 7-CB-16912. On July

30, 2010, a consolidated amended complaint ("Complaint II") was issued with respect to these charges.

Complaint II alleges that Comau violated Sections 8(a)(1), (2), (3), and (5) of the NLRA by: failing and refusing to bargain collectively and in good faith with the Charging Union; dominating and interfering with the administration of, and rendering unlawful assistance to, a labor organization; discriminating against employees and thus encouraging membership in a labor organization; and interfering with, restraining, and coercing its employees in the exercise of rights guaranteed in Section 7 of the Act. As to the CEA, Complaint II alleges that the CEA violated Sections 8(b)(1)(A) and (b)(2) of the Act by: restraining and coercing employees in the exercise of rights guaranteed in Section 7 and attempting to cause Comau to discriminate against its employees such that Comau would violate Section 8(a)(3) of the Act. The alleged violations were based on two theories: (1) that the December 2009 disaffection petition that Comau used to conclude that the ASW/MRCC did not represent a majority of employees in the unit was tainted by Comau's March 1, 2009 unilateral implementation of its new health care plan, which was alleged to constitute an unfair labor practice; and (2) that the disaffection petition was tainted because certain individuals who circulated it– specifically, Harry Yale, James Reno, and Nelson Burbo– did so with the apparent authority of Comau.

On May 20, 2010, ALJ Bogas issued his decision with respect to Complaint I, concluding that Comau engaged in an unlawful labor practice and therefore violated the NLRA when it implemented its new health care plan on March 1, 2009. (Doc. 1 Ex. 2.)

11

ALJ Bogas found that while Comau and the ASW/MRCC were at impasse on December 22, 2008 when Comau implemented its Last Best Offer, the impasse had passed in January 2009 when the parties continued to engage in negotiations regarding the health insurance issue. The ALJ rejected the other violations alleged in the complaint and declined to make a determination with respect to the decertification petition. Comau appealed ALJ Bogas' decision. The Board affirmed on November 5, 2010. (Doc. 49 Ex. 2.) In the interim, ALJ Geoffrey Carter conducted hearings with respect to Complaint II in August and September 2010.

On September 15, 2010, the Board filed the instant petition in this Court against Comau and the CEA pursuant to § 10(j) of the NLRA, 29 U.S.C. § 160(j). The Board filed an amended petition on October 4, 2010. In the petition, the Board alleges that Comau violated Sections 8(a)(1), (2), (3) and (5) of the NLRA when it withdrew recognition from the ASW/MRCC, recognized the CEA, and negotiated and entered into a CBA with the CEA following disaffection caused by an unremedied unfair labor practice– that being the unilateral implementation of the new healthcare plan on March 1, 2009. The Board also alleges that Comau violated the NLRA when *its* "agents," Harry Yale, Nelson Burbo III, and James Reno, circulated the disaffection petition. The Board asks the Court to enter an injunction requiring Comau to cease and desist from recognizing the CEA as the collective bargaining representative of the bargaining unit, from giving effect to the CBA between Comau and the CEA, from unilaterally changing employees' terms and conditions of employment, and from deducting dues from

12

employees' wages and remitting them to the CEA.[5]  The Board also seeks to compel Comau to recognize and bargain with the ASW, which had since become affiliated with the Carpenters Industrial Council, United Brotherhood of Carpenters and Joiners of America.

With respect to the CEA, the Board alleges that the CEA violated Sections 8(b)(1)(A) and (2) of the NLRA by accepting Comau's recognition as the bargaining representative of the unit and negotiating and entering into a CBA with Comau that requires the payment of union dues to the CEA, even though the CEA does not represent an uncoerced majority of the bargaining unit.  The Board seeks to enjoin the CEA from acting as the bargaining representative of the unit and from maintaining a CBA with Comau.

Comau and the CEA filed answers to the petition on October 11, 2010.  On the same date, Comau also filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  As part of its motion, Comau also seeks sanctions against Petitioner pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. §§ 1927 and 2412.  Comau argues that there is no legal or factual basis for the injunction Petitioner seeks and that

---

[5]As discussed *infra*, after the amended petition was filed, the NLRB issued a decision with respect to Complaint I.  A district court's § 10(j) injunction expires upon the issuance of a Board decision.  Therefore, Petitioner moved and was granted permission on November 18, 2010 to modify the injunctive relief it seeks in this case in light of the Board's decision.  The relief set forth above reflects Petitioner's modified request.  (*See* Doc. 49.)

Petitioner has wrongfully aided the ASW/MRCC in pursuing charges against Comau.[6]

The petition and motion to dismiss have been fully briefed and the parties have submitted

volumes of exhibits in support of their respective positions regarding the requested

injunction.  The Court held a motion hearing with respect to the pending pleadings on

January 13, 2011.

Prior to the hearing, on December 14, 2010, the Regional Director issued a

decision and order with respect to Case 7-RD-3644– addressing the April 14, 2009

decertification petition.  (Doc. 54 Ex. A.)  Finding a causal relationship between Comau's

implementation of the new health care plan on March 1, 2009, which the Board

previously held constituted an unfair labor practice ("ULP"), and the decertification

petition, the Regional Director concluded that the petition should be dismissed.  (*Id*.)

Also prior to the hearing in this case, on December 21, 2010, ALJ Carter issued his

decision with respect to Complaint II.  In his decision, ALJ Carter concludes that there is

a causal relationship between the loss of majority support for the ASW/MRCC evidenced

in the decertification and disaffection petitions and Comau's ULP found by ALJ Bogas

and the Board– that being, Comau's implementation of the new health care plan on March

---

[6]In its reply brief in support of its request for sanctions, Comau indicates that "[i]t
is premature to argue about sanctions" and that it only intended to provide "fair warning"
to Petitioner until the underlying issues are resolved that it may be seeking sanctions.
(Doc. 46 at 1.)  The Court therefore will not rule on Comau's motion for sanctions, will
deny the motion without prejudice, and will allow Comau to re-file its request for
sanctions if it chooses to do so once the petition for injunction is resolved.  At that time,
Comau can argue why, based on the resolution of the underlying issues, sanctions are
appropriate.

14

1, 2009.[7]  Finding that Comau engaged in unfair labor practices likely to diminish

ASW/MRCC's status, ALJ Carter concludes that Comau could not lawfully withdraw

recognition from the union and recognize the CEA as the bargaining representative of the

unit.  ALJ Carter, however, found no evidence that Comau, through its agents, facilitated

or participated in the disaffection petition.  Based on his rulings, ALJ Carter recommends

that the Board enter an injunction similar, in part, to that sought in the present petition.

     Comau and the CEA are filing exceptions to ALJ Carter's decision, which are due

to be filed on February 15, 2011.  (*See* Doc. 63 at 8.)

## II.    Comau's Motion to Dismiss

     As indicated previously, in addition to filing an answer to the petition, Comau has

filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  A rule

12(b)(6) motion tests whether a legally sufficient claim has been pleaded in the

complaint, and provides for dismissal when a plaintiff fails to state a claim upon which

relief may be granted. Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, – U.S. – , 129 S. Ct. 1937, 1949

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 570, 127 S. Ct. 1955, 1974

---

    [7]Complaint II also alleged that Comau and the CEA violated the NLRA by conduct
that reasonably could coerce employees to sign dues-checkoff authorization forms.  ALJ
Carter found that the CEA engaged in this misconduct, but found no evidence that Comau
did so.  These findings, however, are not relevant to the injunction sought in this Court as
there is no claim that this misconduct caused the employees' disaffection with the
ASW/MRCC.

(2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct.  *Id*. (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).  This plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965.

When assessing whether a plaintiff has set forth a "plausible" claim, the district court must accept all of the complaint's factual allegations as true.  *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  Even so, "the pleading must contain more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. at 1965. A plaintiff has the duty to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . .." *Id*.  Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, – U.S. – , 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965).

As an initial matter, to accept the arguments in Comau's motion to dismiss, the Court would be required to consider matters outside the Board's petition.  For this reason alone, the Court is persuaded to deny the motion to dismiss. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) ("Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss.")  In addition, however, the Board has adequately alleged facts in its petition, when presumed true, to render its

16

theories "facially plausible."  The Court therefore is denying Comau's motion to dismiss.

In actuality, Comau's motion is an answer to the petition which asks the Court to consider evidence submitted by Comau– and not set forth in the Board's petition– to find that there is no causal relationship between the March 1, 2009 implementation of the new health care plan and employee disaffection *and/or* that granting the requested preliminary injunction would not be just and proper.  The Court therefore will consider Comau's motion for that purpose.

### III.   Applicable Law as to Section 10(j) Injunctive Relief

Section 10(j) of the NLRA authorizes district courts to grant preliminary injunctions pending the Board's adjudication of unfair labor practice cases:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 106(j).  The Sixth Circuit Court of Appeals has set forth two findings that a district court must make before granting a § 10(j) injunction.  First, the court must find "reasonable cause" to believe that the alleged unfair labor practice occurred.  *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234 (6th Cir. 2003) (citing *Schaub v. West Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001)).  Second, the court must determine whether injunctive relief would be "just and proper."  *Id.*

17

In *Ahearn*, the appellate court summarized the "reasonable cause" analysis as follows:

> Petitioner's burden of showing "reasonable cause" is "relatively insubstantial," inasmuch as the proof requires only that the Board's legal theory underlying the allegations of unfair labor practices be "substantial and not frivolous" and that the facts of the case be consistent with the Board's legal theory. *Schaub*, 250 F.3d at 969 . . . In reviewing the supporting facts, a district court "need not resolve conflicting evidence between the parties" or make credibility determinations." *Id.* . . . "Rather, so long as facts exist which could support the Board's theory of liability, the district court's findings cannot be clearly erroneous." *Id.* (citations omitted). Indeed, fact-finding is inappropriate in the context of a district court's consideration of a 10(j) petition.

351 F.3d at 237 (additional citations omitted). Further, to conclude that the facts support the Board's legal theory, the Court need only find "some evidence in support of the petition." *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987) (citing *Levine v. C & W Mining, Inc.*, 610 F.2d 432, 435 (6th Cir. 1979)).

"The 'just and proper' inquiry . . . turns primarily on whether a temporary injunction is necessary 'to protect the Board's remedial powers under the NLRA.'" *Schaub*, 154 F.3d at 279 (quoting *Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 214 (6th Cir. 1995)). When making this determination, "'[c]ourts must be mindful that the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.'" *Ahearn*, 351 F.3d at 239 (quoting *Schaub*, 154 F.3d at 279) (internal quotation marks and citations omitted)). "Where the Board's remedial powers would be ineffective without a court order temporarily returning the protagonists to the positions they occupied before

18

occurrence of the alleged unfair labor practice, the district court normally has discretion to issue such an order." *Schaub*, 154 F.3d at 279.

A district court does not review an ALJ's decision on the merits of an unfair labor charge, nor does it sit in review of the final decision of the Board.  Review of the Board's determination of an unfair labor practice charge is reserved to the Courts of Appeals.  *See* 29 U.S.C. § 160(f).  Both decisions, however, are relevant to a district court's assessment of the propriety of § 10(j) relief.  "The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed."  *Bloedern v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001).

## IV.   Analysis

As indicated earlier, the Board presents two legal theories in support of its § 10(j) petition.  First the Board asserts that Comau's unfair labor practice of March 1, 2009– that being, the unilateral implementation of the new health insurance plan– caused the employee's disaffection with the ASW/MRCC and therefore Comau could not lawfully withdraw recognition of the ASW/MRCC and recognize the CEA as the unit's bargaining representative.  The Board also asserts that Comau's agents provided unlawful assistance and encouragement related to the circulation of the disaffection petition.

This Court can quickly dispose of the Board's second theory.  As ALJ Carter, in this Court's view, correctly found, there is no evidence that Yale, Burbo, or Reno were acting as agents of Comau when they circulated the disaffection petition or that any agent

19

of Comau facilitated or participated in the circulation of that petition or the earlier

decertification petition.  Yale, Burbo, and Reno were members of the bargaining unit and

the union's executive committee.  By definition, they could not be agents of the employer.

*See* 29 U.S.C. § 152(2) ("The term 'employer' includes any person acting as an agent of

an employer, directly or indirectly, but shall not include . . . any labor organization (other

than when acting as an employer, or anyone acting in the capacity of officer or agent of

such labor organization.")

 As to the Board's first theory, Comau and the CEA spend little time arguing

whether Comau's March 1, 2009 implementation of the new health care plan constituted

an unfair labor practice.  Instead, they focus on the Board's claim of a nexus between that

alleged ULP and employee disaffection and contend that the asserted nexus is not

substantial and is frivolous.[8]

 "The Board has long held that an employer may not withdraw recognition [of a

union] based on employee disaffection *if* there is a causal nexus between the disaffection

and unremedied unfair labor practices."  *NLRB v. AT Sys. West, Inc.*, 341 NLRB 57, 59

(2004) (emphasis added) (citing *Olson Bodies, Inc.*, 206 NLRB 779, 780 (1973)).

---

 [8]Comau argued before ALJ Bogas and mentions in its brief that charges relating to
the March 1, 2009 implementation of the new health care plan are precluded by the
finding that its December 22, 2008 announcement of the plan did not constitute an unfair
labor practice.  ALJ Bogas addressed this argument in his decision, finding that the
charge is not precluded.  (*See* Doc.1 Ex. 2 at 16.)  ALJ Bogas further found that because
any impasse existing on December 22, 2008, had been eliminated as of January 7, 2009,
Comau engaged in an unfair labor practice when it went ahead and implemented the new
health care plan on March 1, 2009.

However, "[n]ot every unfair labor practice will taint evidence of a union's subsequent loss of majority support; in cases involving unfair labor practices other than a general refusal to recognize and bargain, there must be specific proof of a causal relationship between the unfair labor practice and the *ensuing* events indicating a loss of support." *NLRB v. Lee Lumber and Bldg. Material Corp.*, 322 NLRB 175, 177 (1996) (citing *Williams Entm't*, 312 NLRB 937, 939 (1993), enfd. 50 F.3d 1280 (4th Cir. 1995)). "The unremedied unfair labor practices must be of a character as to either affect the union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." *AT Sys. West*, 341 NLRB at 59-60.

The Board has established several factors relevant in determining whether there is a causal relationship between an unfair labor practice and employee disaffection. Those factors include:

> (1) the length of time between the unfair practices and the withdrawal of recognition; (2) the nature of the violations, including the possibility for a detrimental or lasting effect on employees; (3) the tendency of the violation to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union.

*East Bay Automotive Council v. NLRB*, 483 F.2d 628, 634 (6th Cir. 2007) (citing *Master Slack Corp.*, 271 NLRB 78, 84 (1984)). In assessing the tendency of an unlawful labor practice to cause employee disaffection, the Board applies an objective, rather than a subjective test. *AT Systems West*, 341 NLRB at 60 (citations omitted). "[I]t is the objective evidence of the commission of unfair labor practices that has the tendency to

21

undermine the Union, and not the subjective state of mind of the employees, that is the relevant inquiry in this regard." *Id.*

As ALJ Carter found in his decision, the Board has held that an employer's unilateral imposition of a new health care plan– particularly one requiring significant employee-paid premiums not previously imposed– has the possibility of a detrimental and lasting effect on employees, as well as a tendency to cause disaffection. (Doc. 58 Ex. A at 20 (citing *Priority One Servs*, 331 NLRB 1527 (2000) (collecting cases).) The problem in this case, however, is that employee discontent with the ASW/MRCC *preceded* the alleged unfair labor practice. In fact, the decertification petition was signed by a sufficient number of bargaining unit members (71) before March 1, 2009– when Comau unilaterally implemented the new health care plan– to require the Board to take a vote to certify the results. *See* 29 U.S.C. § 159(e)(1) ("Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.") As ALJ Carter found, the disaffection petition in December 2009 simply "was essentially an effort to renew the Spring 2009 decertification movement . . ." (Doc. 58 Ex. A at 19.)

ALJ Carter found a causal connection between the employees pre-ULP signing of the decertification and the ULP because the employees were aware of the new health care

plan and its upcoming implementation.  This Court finds several problems with this

analysis.  First, the NLRB's decisions reflect that "there must be specific proof of a causal

relationship between the unfair labor practice and the *ensuing* events indicating a loss of

support."  *Lee Lumbar and Bldg. Material Corp.*, 322 NLRB at 177 (emphasis added).[9]

The evidence shows that in the present case, before the unfair labor practice, a percentage

of the bargaining unit's members sufficient to require an election had signed a

decertification petition indicating a loss of their support in the ASW/MRCC.  The

evidence further shows that the loss of support for the union expanded much further than

the health care issue.  Executive committee members began to research how to

accomplish decertification as early as December 2008. The Board already has found that

the announcement of the new health care plan in December 2008 did not constitute an

unfair labor practice and nothing Comau did prior to March 1, 2009 (such as preparing for

and informing the employees of the change), has been suggested to have constituted an

unfair labor practice.

The Court also notes that up to and following March 1, 2009, Comau still was

engaged in negotiations with ASW/MRCC representatives to reach an agreement with

respect to an alternative health care plan.  In fact on February 20, 2009, members of the

ASW/MRCC bargaining committee presented a healthcare proposal that met the amount

Comau offered to contribute toward an ASW/MRCC plan and, at the end of the meeting,

---

[9]The Board's theory, which puts the cause *after* the effect, therefore is backwards.

Comau's negotiators indicated that they would review the union's proposal and respond by March 20, 2009. Thus a day after most employees signed the decertification petition, Comau and the ASW/MRCC were close to resolving the health care issue and there was reason to believe that the health care plan in fact would not be implemented. These facts suggest that the health care issue was not the driving force behind the bargaining unit members' disaffection.

There is no evidence suggesting that the March 1, 2009 implementation of the new health care plan led to lingering resentment toward the ASW/MRCC causing bargaining unit members to sign the disaffection petition and Authorization for Representation forms in December 2009. The evidence, to the contrary, indicates that the decision to pursue the disaffection petition was born out of the NLRB's failure to act on the decertification petition filed on April 14, 2009, and the reminder as the administrative proceedings ensued that the petition was being delayed by the unfair labor charges against Comau. The Court finds no evidence that any employee discontent arising from the implementation of the new health care plan was carried forward by the administrative hearings. Significantly, the CBA that Comau and the CEA subsequently negotiated and the bargaining unit ratified included the very same health insurance plan that Comau unilaterally implemented on March 1, 2009.

The Court acknowledges that there is a scintilla of evidence suggesting a causal relationship between the alleged ULP and the disaffection of at least some members of the bargaining unit, although the Court questions whether it is sufficient to even satisfy

24

the Board's slight burden to demonstrate reasonable cause.[10]   The Court flatly rejects,

however, the Board's evidence of a change in ASW/MRCC meeting attendance after

March 1, 2009, to demonstrate a causal connection between Comau's implementation of

the new health care plan and disaffection.  (*See* Doc. 1 Ex. 18.)  David Baloga's assertion

in his affidavit, notably prepared by Petitioner's counsel, that membership at

ASW/MRCC meetings began to drop after March 1 is contrary to the meeting records and

appears intentionally misleading.  (Doc. 34 Ex. D Tabs 1, 3.)  In fact, attendance at

ASW/MRCC meetings after March 1, 2009 was frequently higher than at the same time

the previous year.  For example, 46 and 22 members attended meetings in April and May

2008, respectively.  In comparison, in April and May 2009, attendance was 48 and 26

members.[11]  (*Id.*)  There were 26 members present at a meeting in July 2008, compared to

32 members in July 2009.  (*Id.*)  Only starting in August 2009 did the number of attendees

decline compared to the same month the year before, yet attendance until November 2009

remained above 25 members.[12]  (*Id.*)  Because this decrease occurred at least five months

after Comau's implementation of the new health care plan, the Court does not find it

---

[10]For example, thirty four additional employees signed the decertification petition
on or after March 1, 2009, and there was testimony that the new health care plan and the
premiums employees would be required to pay under the plan caused, at least in part,
some employees to sign the decertification petition.

[11]The fact that more members attended ASW/MRCC meetings *after* March 1, 2009
further supports a finding of no causation.

[12]Notably, attendance fell below or hovered around 25 members at certain
meetings in 2008 as well, such as the meetings on May 15, 2008 (22 attendees), July 1,
2008 (26 attendees), and November 5, 2008 (25 attendees).  (Doc. 34 Ex. D Tabs 1, 3.)

demonstrative of a causal relationship.  However, even if the Court concluded that the Board satisfied its burden of demonstrating reasonable cause, the Court also concludes that injunctive relief is not just and proper.

The Board contends that a preliminary injunction is necessary to prevent the further "irreparable erosion" of member support for the ASW/MRCC.  (Doc. 28 at 34.) The Board also argues that "without some form of immediate interim relief, employees will be unjustly deprived of the fruits of collective bargaining, . . . and industrial peace will be destabilized."  (*Id*. at 36.)

As discussed above, however, the evidence indicates that erosion of support for the ASW/MRCC reached a level sufficient to require an election before the unlawful labor practice occurred.  With the exception of Reuter and Robertson (who no longer worked at Comau's facilities) the members of the ASW/MRCC's executive committee unanimously voted to decertify their union in late December 2008 or early January 2009.  Moreover, a significant amount of time passed between December 22, 2008– when employees first became aware of the impending health care plan change– and December 22, 2009– when they signed the disaffection petition.

No member of the bargaining unit testified during the administrative proceedings that he signed the disaffection petition in December 2009 because of the implementation of the health care plan ten months earlier.  In comparison, thirteen witnesses testified that Comau's action on March 1, 2009, was *not* the cause of their decision to sign the disaffection petition.  CEA sought to present ninety additional witnesses who would

testify similarly, but ALJ Carter ruled that the evidence would be cumulative.  The

disaffection petition also states that Comau's implementation of the new health care plan

did not influence members to sign the petition; but instead, that those signing the petition

were influenced by the ASW/MRCC's broken promises regarding increased job

opportunities and high union dues.

Even if the employees' subjective reasons for signing the disaffection petition are

not relevant in the Court's "reasonable cause" analysis, those reasons are influential in the

Court's analysis of whether a preliminary injunction would be just and proper.  This

evidence suggests that bargaining unit members did not reject the ASW/MRCC and seek

representation by CEA *because of* Comau's March 1, 2009 unfair labor practice.  In this

Court's view, enjoining the representation of members by their chosen union, requiring

them to be represented by a union they rejected without coercion, and blocking the

enforcement of a CBA negotiated by the union chosen by the membership and ratified by

the members is contrary to the NLRA's goals.

There are additional factors supporting the Court's conclusion that preliminary

injunctive relief would not be just and proper in this case.  First, the Board was aware of

the membership's discontent in early March 2009, and their signatures on the disaffection

petition and Authorization for Representation forms in December 2009, asking Comau to

withdraw recognition of the ASW/MRCC as their representative and to recognize the

CEA instead.  Yet the Board did not seek § 10(j) injunctive relief until September 15,

2010.  During the Board's delay, the members proceeded with their new union and

27

entered into a CBA with that union as their representative.

Second, the Court finds it unlikely that membership support for the ASW/MRCC will erode any further in the time it should take the Board to review and decide whether to affirm ALJ Carter's decision.  Further, there is nothing suggesting that, when the Board reaches its decision, it will be less likely to provide remedial relief if this Court does not now enter preliminary injunctive relief.

Third, the CEA points out that returning to the status quo as it existed before March 1, 2009, is no longer possible.  According to the CEA, on March 1, 2010, the ASW disaffiliated from the MRCC and became an affiliate of the Carpenters Industrial Council (CIC).  In March 2007, members of the bargaining unit voted to merge the ASW with the MRCC; they have not voted to accept the CIC as their bargaining representative. Finally, Comau's and the CEA's exceptions to ALJ Carter's decision are due to be filed with the Board on or before February 15, 2011.  An answer to those exceptions and any cross-exceptions must be filed within 14 days of that date and the Board's policy is to issue expedited decisions in cases where § 10(j) proceedings are pending.  *See* 29 C.F.R. § 102.94.  Thus any preliminary injunction entered by this Court is expected to be short-lived.  Considering the time that already has passed since the unlawful labor practice, it is unlikely that any harm that has ensued as a result of the unfair labor practices will become greater without such a temporary and brief injunction.

**V.    Conclusion**

For the reasons set forth above, the Court concludes that a temporary injunction

pursuant to § 10(j) is not supported by reasonable cause and/or would not be just and proper.

Accordingly,

**IT IS ORDERED**, that the petition for injunction under Section 19(j) of the National Labor Relations Act filed by Petitioner Stephen M. Glasser, Regional Director of the Seventh Region of the National Labor Relations Board, on behalf of the National Labor Relations Board is **DENIED**;

**IS IT FURTHER ORDERED**, that Comau, Inc.'s motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is **DENIED**.


DATE: February 10, 2011                              s/PATRICK J. DUGGAN
                                                     UNITED STATES DISTRICT JUDGE
Copies to:
Counsel of Record

29